UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRENDA MARTINEZ; PEDRO BERNAL; and A.B., a minor, by and through her Guardian ad Litem, William J. Phippard,<br><br>                                    Plaintiffs,<br><br>                    vs.<br><br>M.D. SHALON NIENOW; M.D. SARAH VEGA; M.D. NATALIE LAUB; RADY CHILDREN'S HOSPITAL; COUNTY OF SAN DIEGO; SOCIAL WORKER 1; SOCIAL WORKER 2; and DOES 1 through 50, inclusive,<br><br>                                    Defendants. | Case No.:  3:23-cv-02338-RBM-AHG<br><br>**ORDER**<br><br>**(1) GRANTING IN PART AND DENYING IN PART THE INDIVIDUAL DEFENDANTS' MOTION TO DISMISS**<br><br>**(2) DENYING RADY'S MOTION TO DISMISS**<br><br>**[Docs. 38, 37]** |

On December 27, 2023, Plaintiffs Brenda Martinez ("Martinez"), Pedro Bernal ("Bernal"), and A.B., a minor, by and thought her Guardian ad Litem, William J. Phippard, ("Minor A.B.") (collectively, "Plaintiffs") filed a Complaint for Damages ("Complaint") against Shalon Nienow, M.D. ("Nienow"); Sarah Vega, M.D. ("Vega"); Natalie Laub,

M.D. ("Laub"); and Rady Children's Hospital ("Rady"), among others.[1]    (Doc. 1 ["Compl."].)

On June 10, 2024, Defendants Nienow, Vega, and Laub (collectively, the "Individual Defendants") filed a Motion to Dismiss Plaintiffs' Complaint (the "Individual Defendants' MTD").  (Doc. 38.)  On July 8, 2024, Plaintiffs filed an Opposition to the Individual Defendants' MTD.  (Doc. 41.)  On July 15, 2024, the Individual Defendants filed a Reply in support of their MTD.  (Doc. 44.)

On June 10, 2024, Rady filed a Motion to Dismiss Plaintiffs' Complaint Pursuant to Rule 12(b)(6) ("Rady's MTD").  (Doc. 37.)  On July 8, 2024, Plaintiffs filed an Opposition to Rady's MTD.  (Doc. 40.)  On July 15, 2024, Rady filed a Reply in support of their MTD.  (Doc. 43.)

The Court finds this matter suitable for determination without oral argument pursuant to Civil Local Rule 7.1(d)(1).  For the reasons discussed below, the Individual Defendants' MTD is **GRANTED IN PART** and **DENIED IN PART**, and Rady's MTD is **DENIED**.

## I.    FACTUAL BACKGROUND[2]

### A.    The Parties

Minor A.B. is a special needs child born in 2018.  (Compl. ¶¶ 13–14.)  She was born with severe medical conditions, including global developmental delay, developmental dysplasia of the hip, hydronephrosis (a kidney problem), vitiligo (a skin condition), and urticaria (another skin condition).  (*Id.* ¶ 14.)  She has minimal language development and speaks fewer than a half dozen words.  (*Id.*)

---

[1] The Court granted Plaintiffs' Motion seeking dismissal of Defendants County of San Diego (the "County"), Social Worker 1, and Social Worker 2 (collectively, the "County Defendants") with prejudice following settlement.  (Doc. 28.)

[2] The Court's summary of Plaintiffs' Complaint reflects Plaintiffs' factual and legal allegations, not conclusions of fact or law by this Court.

Plaintiff Martinez is the natural mother of Minor A.B., and Plaintiff Bernal is the natural father of Minor A.B.. (*Id.* ¶ 13.)

Defendant Rady "is a medical center, the specific form of which is presently unknown, located in the County of San Diego." (*Id.* ¶ 6.)

Defendant Nienow was a physician contracted to conduct forensic examinations of children at various locations, including Rady, Rady's Chadwick Center for Children and Families ("Chadwick"), and the County's Polinsky Children's Center ("Polinksy"). (*Id.* ¶¶ 3, 38, 43.)

Defendant Vega was a physician contracted to conduct forensic examinations of children at various locations, including Rady, Chadwick, and Polinsky. (*Id.* ¶¶ 4, 45.)

Defendant Laub was a physician contracted to conduct forensic examinations of children at various locations, including Rady, Chadwick, and Polinsky. (*Id.* ¶¶ 5, 44.)

**B.    Relevant Facts**

**1.    January 6, 2022**

On January 6, 2022, Martinez took Minor A.B. to her urologist, Dr. Kelly Anne Swords, to address her hydronephrosis condition. (*Id.* ¶ 16.) During the visit, Martinez also showed Dr. Swords a rash and hives that had developed on Minor A.B.'s neck and abdomen. (*Id.*) Martinez informed Dr. Swords that Minor A.B. had developed the rash over the preceding 24 hours and that Minor A.B. had been picking and scratching at her neck. (*Id.*) Martinez further informed Dr. Swords that Minor A.B. had experienced hives off and on since November and that Minor A.B. had an upcoming appointment with her dermatologist and an allergist regarding the condition. (*Id.*)

Dr. Swords suggested that Martinez take Minor A.B. to urgent care. (*Id.*) Dr. Swords noted no other concerns, and the medical records for this visit verified that Minor A.B. had upcoming appointments with her dermatologist and allergist, scheduled for January 25th and February 15th, respectively. (*Id.*)

Martinez took Minor A.B. to Rady's urgent care/emergency department. (*Id.* ¶ 17.) There, Martinez advised that Minor A.B. had experienced red bumps on her chest and

abdomen on and off since November; that the red bumps would become discolored from Minor A.B. picking and scratching them; and that over the last three days, a similar rash had developed on Minor A.B.'s neck.  (*Id.*)

Minor A.B. was seen by Dr. Michele A. McDaniel.  (*Id.*)  Martinez showed Dr. McDaniel pictures of the hives and discoloration that had been occurring since November and informed Dr. McDaniel that the skin condition was itchy and would cause swelling around her eye.  (*Id.*)  She informed Dr. McDaniel that Minor A.B. had upcoming appointments with her dermatologist and an allergist. (*Id.*)  She also informed Dr. McDaniel that Minor A.B. had anemia.  (*Id.*)

"Dr. McDaniel noted a large petechial patch along the neck, scattered patches on the abdomen, and petechiae to the skin surrounding the right and left eye."  (*Id.*)  "She took photographs of her findings."  (*Id.*)  "Dr. McDaniel noted that Minor A.B. was well appearing on exam other than the bruising and rash."  (*Id.*)  "Dr. McDaniel's differential diagnosis was 1) urticaria and patient scratching so hard as to cause bruising; 2) thrombocytopenias; 3) abnormal coagulopathy; and 4) 'inflicted injury such as strangulation.'"  (*Id.*)

"Dr. McDaniel [also] ordered blood work, a skeletal survey, and consults with the hospital social worker and 'CPT,' Rady's Child Protection Team …."  (*Id.*)  "The skeletal survey, undertaken shortly after Dr. McDaniel's exam, was negative for fractures.  The labs were significant for anemia … ."  (*Id.* ¶ 18.)

Defendant Nienow was the "on call" child abuse pediatrician for Rady at the time.  (*Id.* ¶ 19.)  Based on a handful of photographs taken in the emergency room, Nienow concluded that this was a "strangulation event."  (*Id.*)  Nienow also determined that the bruising seen on Minor A.B.'s abdomen was "highly suspicious for a human bite mark."  (*Id.*)  Nienow concluded, "[i]f [Minor A.B.] were to be returned to the environment in which her injuries were sustained without identification and removal of the perpetrator[,] it would place her at extreme risk of ongoing and potentially escalating forms of maltreatment."  (*Id.*)  Nienow advised that an immediate report should be made to law

enforcement and child welfare services, and that Minor A.B. should be seen at Chadwick the following day for a full forensic examination.  (*Id.*)

"*Nienow did not go to the emergency room, examine [Minor] A.B., speak with [Martinez], or review any of [Minor] A.B.'s extensive past history.*"  (*Id.* (emphasis in original).)  "*Nor did Defendant Dr. Nienow speak with Dr. Swords or Dr. George K. Hightower, [Minor] A.B.'s dermatologist who had been treating her skin conditions.*"  (*Id.* (emphasis in original).)

Nienow then informed the County of San Diego's social workers that the marks on Minor A.B.'s neck were caused by pressure being applied and blood vessels popping—i.e., strangulation—and that strangulation was the *only* explanation for the findings.  (*Id.* ¶ 20 (emphasis in original).)  Based upon Nienow's opinion, the social workers removed Minor A.B. from the care and custody of her parents and transported her to Polinsky.  (*Id.* ¶ 21.)

### 2.    January 7, 2022

On January 7, 2022, Minor A.B. was taken to Chadwick, where she was seen by Defendant Vega.[3]  (*Id.* ¶ 22.)  Martinez and Bernal were not notified of this examination, were not given the opportunity to be present at this examination, did not consent to this examination, and there was no court order authorizing the examination.  (*Id.*)  Vega noted in her evaluation that Minor A.B.'s past medical history was obtained through a review of Minor A.B.'s medical records as there was no parent present at the examination.  (*Id.* ¶ 23.)  Plaintiffs allege that Vega, who is a "Certified Bilingual Provider Spanish," compounded the County's failure to give Minor A.B.'s parents notice by failing to call Martinez, who was available to provide A.B.'s medical history by phone or to be physically present at a moment's notice.  (*Id.*)  Defendant Laub "admitted to a language barrier with respect to getting a history from [Martinez].  There was [] no evidence that [] Laub had reviewed any of [Minor] A.B.'s medical history."  (*Id.* ¶ 33.)

---

[3] It appears that Minor A.B. was also seen by Defendant Laub on this date; however, Plaintiffs' Complaint is not explicit.

"A complete examination was performed, including an examination to rule out sexual abuse." (*Id.* ¶ 25.) "The examination made the same findings regarding skin condition that Dr. McDaniel had made the day before." (*Id.*) Defendant Laub concluded, after reviewing labs and tests available, that "the child's physical exam is consistent with a strangulation event" and that she could "not rule out blunt force trauma as well." (*Id.*) Defendants Vega and Laub stated in their report that the location and pattern of Minor A.B.'s "injuries" were "indicative of a strangulation event" and that the location of the bruises on Minor A.B.'s abdomen were "highly concerning for non-accidental trauma." (*Id.*) Vega and Laub also concluded that, if Minor A.B. were "returned to the environment in which her injuries were sustained, it would place her at extreme risk of further maltreatment and potentially death." (*Id.*) "There is no evidence in the record of the examination that either Vega or Laub reviewed any of Minor A.B.'s past medical history or spoke with Dr. Swords or Dr. Hightower." (*Id.*)

"Vega and Laub [also] noted that A.B. also had a fever and was tachycardic, and recommended that urine be collected at Polinsky." (*Id.*) Minor A.B. returned to Polinsky, where urine was collected and sent to the lab. (*Id.* ¶ 27.) Martinez and Bernal were also not notified of this examination, were not given the opportunity to be present at this examination, did not consent to this examination, and there was no court order authorizing the examination. (*Id.*)

### 3. January 10, 2022

On January 10, 2022, the County social workers submitted a Detention Report to the Juvenile Court. (*Id.* ¶ 31.) Attached to the Detention Report was Defendant Nienow's report, which clearly implied that she had examined Minor A.B. on January 6, 2022 and/or January 7, 2022 even though Nienow did not examine Minor A.B., did not review Minor A.B.'s medical history, did not speak with Minor A.B.'s parents, and did not speak to Minor A.B.'s medical providers. (*Id.*) Nienow's report was based on her review of photographs. (*Id.*)

Based on Nienow's knowingly false report, the County social workers "opined that 'the evidence at this time overwhelmingly supports the conclusion [Minor A.B.] was strangled to the point that blood pooled in her head and caused capillaries to burst,' and that 'an individual intentionally strangled the child in an act of physical abuse.'" (*Id.*) The County social workers also advised that Minor A.B. "'sustained bruising to her throat and face diagnostic [sic] of strangulation,' and that '[t]he [a]gency is worried that if a member of [Minor A.B.'s] household continues to strangle the child, the child may be severely injured to include further bruising, broken bones, brain injury or death.'" (*Id.*) The social workers also "stated that '[the] [c]aregiver's explanation for the injury to the child is questionable or inconsistent with the type of injury, and the nature of the injury suggests the child's safety may be of immediate concern.'" (*Id.*) The social workers recommended that Minor A.B. continue to be detained. (*Id.*) The social workers' statements and recommendation were based entirely on Nienow's report. (*Id.*)

### 4. January 19, 2022

On January 19, 2022, Minor A.B. saw her dermatologist, Dr. George K. Hightower, for the appointment that had been scheduled at the time of her January 6, 2022 emergency room visit. (*Id.* ¶ 32.) Dr. Hightower diagnosed Minor A.B. with urticaria and noted that "bruising can occur following urticarial lesions if [the] site is subject to frequent scratching or rubbing by the child." (*Id.*)

### 5. February 1, 2022

On February 1, 2022, the County social workers submitted an additional report to the Juvenile Court, which summarized their discussion with Dr. Hightower. (*Id.* ¶ 33.) They also reported a discussion with Minor A.B.'s primary care physician, Dr. Rylee Scott, who opined that the marks on Minor A.B.'s neck and the petechiae were "consistent with a new location and exacerbation of her preexisting rash" and "not traumatic bruising." (*Id.*) Nevertheless, the County social workers advised the Juvenile Court that they wished to continue to detain Minor A.B. (*Id.*)

### 6. February 15, 2022

On February 15, 2022, the County social workers submitted an Addendum Report to the Juvenile Court. (*Id.* ¶ 34.) The social workers reported that Dr. Swords had no concerns about Martinez, that it was Martinez who pointed out the lesions on Minor A.B.'s neck, that Minor A.B. was scratching and itching at the lesions on her neck, and that she believed it might be some type of blood disorder, which is why she sent Martinez and Minor A.B. to the emergency room. (*Id.*) The social workers also reported that Dr. Hightower noted a history of petechiae during fevers. (*Id.*) The social workers further reported that Defendant Laub refused to retreat from her strangulation theory despite alternative explanations. (*Id.*) The social workers recommended that the petition be dismissed. Despite their discretion to return Minor A.B. to the care and custody of her parents, the social workers did not return Minor A.B. to the care and custody of her parents on this date. (*Id.*)

### 7. March 10, 2022

On March 10, 2022, the Juvenile Court conducted a hearing (*id.* ¶ 35), dismissed the petition against Martinez and Bernal, and terminated its jurisdiction over Minor A.B (*id.* ¶ 36). "[T]he [c]ourt instructed [r]evenue and [r]ecovery that they were not to collect any reimbursable costs from the parents." (*Id.*) Despite this order, the County continues to send delinquency notices to Martinez and Bernal in an attempt to collect money arising from the dependency matter. (*Id.* ¶ 37.)

### C. *Monell* Allegations[4]

Plaintiffs allege that Chadwick is a program, service, and subdivision of Rady. (*Id.* ¶ 38.) Rady, Chadwick, and the Chadwick team work in collaboration with the County and its Health and Human Services Agency ("HHSA") to investigate suspected child abuse and neglect. (*Id.* ¶¶ 38, 84.) Plaintiffs allege that Rady operates, manages, and supervises

---

[4] *Monell* refers to the United States Supreme Court's decision in *Monell v. Dept. of Soc. Serv. of N.Y.*, 436 U.S. 658, 691 (1978).

3:23-cv-02338-RBM-AHG

the Chadwick team, which includes law enforcement personnel, HHSA personnel, and personnel from the "prosecution." (*Id.* ¶ 39.)

Rady and its Chadwick team routinely collaborate with HHSA, law enforcement, and the Courts. (*Id.* ¶ 40.) Rady and its Chadwick team initiate and authorize forensic interviews and medical examinations, including sexual abuse examinations; acute sexual assault examinations with evidence collection; physical abuse examinations; examinations of neglect, malnutrition, and other concerns; and non-abuse related genital exams. (*Id.*) Rady, through its team at Chadwick, have conducted as many as 769 forensic medical exams at the behest of the HHSA without first obtaining court approval or authorization. (*Id.* ¶ 41.)

"In short, Rady is regularly engaged by the County for its investigatory and 'expert' services, and regularly cooperates in joint action with HHSA to investigate allegations of child abuse—which is categorically a traditional governmental function"—pursuant to the terms of a contract or other similar such agreement with the County. (*Id.* ¶¶ 42, 84.) Rady and the Chadwick team "regularly and systematically perform non-consensual and unwarranted investigatory medical services in collaboration with the County, at the behest of, and direction of, the County and its workers." (*Id.* ¶ 84.)

Plaintiffs allege that Rady established or followed policies that caused the constitutional violations that are the subject of this Complaint, including:

> 1.     "The policy of conducting medical procedures, including examinations, on children removed from their parents without exigent circumstances, court order or warrant, or parental consent; and without notice to or the presence of the children's parents, in violation of the Constitutional rights of children and their parents[.]" (*Id.* ¶ 85a.)

> 2.     "The policy of providing opinions by its medical 'experts' to the County, knowing they will be used to justify the detention and/or continued detention of children from the care and custody of their parents, despite knowledge and information that the opinions of such 'experts' are based on speculation, insufficient information, and faulty methodology. Plaintiffs are informed and believe, and based thereon allege, that the opinions of these child abuse "experts" are routinely questioned by courts, and, in several

instances, courts have stated that the opinions are not credible. Defendant Rady has faced legal action by other families whose lives were torn [sic] as a result of opinions rendered by its staff members." (*Id.* ¶ 85b.)

3.    "By acting with deliberate indifference in implementing a policy of inadequate training, and/or by failing to train its officers, agents and employees, in providing the Constitutional protections guaranteed to individuals, including those under the First, Fourth, and Fourteenth Amendments, when performing actions related to child abuse and neglect, and dependency type proceedings." (*Id.* ¶ 85c.)

4     "The policy of acting with deliberate indifference in failing to correct the wrongful conduct of employees and agents failing to provide the Constitutional protections guaranteed to individuals, including those under the First, Fourth, and Fourteenth Amendments, when performing actions related to child abuse and neglect, and dependency type proceedings." (*Id.* ¶ 85d.)

Plaintiffs allege that Defendant Nienow is an officer, agent, or employee of Rady or Chadwick, working as the Chadwick Medical Clinical Director on behalf of Rady pursuant to its agreement with the County. (*Id*. ¶ 43.) Likewise, Plaintiffs allege that Defendants Vega and Laub are officers, agents, or employees of Rady or Chadwick working on behalf of Rady pursuant to its agreement with the County. (*Id.* ¶¶ 44–45.)

Defendants Nienow, Laub, and Vega acted as liaisons between Rady and the County and its agents. (*Id.* ¶ 48.) Nienow, Laub, and Vega acted as employees or agents of Rady, and in accordance and conformance with the regularly established customs and practices of both Rady and the County. (*Id.*) Defendants Nienow, Laub, and Vega acted under color of law in that they were investigating suspected child abuse at the behest of and in collaboration with the County. (*Id.*)

**D.    Claims of Relief**

In their Complaint, Plaintiffs assert three claims of relief against the Individual Defendants.  Plaintiffs' third claim is for violations of Plaintiffs' First and Fourteenth Amendment rights to familial association and to be free from judicial deception pursuant to 42 U.S.C. §§ 1983, 1985. (Compl. at 1, 18–21.) Plaintiffs' fourth claim is for violations

of Plaintiffs' First, Fourth, and Fourteenth Amendment rights to be free from unlawful medical procedures pursuant to §§ 1983, 1985. (*Id.* at 1, 21–22.) Plaintiffs' seventh claim is for injunctive relief. (*Id.* at 2, 28–29.)

Plaintiffs also assert two claims for relief against Rady. Plaintiffs' sixth claim is for *Monell*-related claims pursuant to 42 U.S.C. § 1983. (*Id.* at 1, 25–28.) Plaintiffs' seventh claim is for injunctive relief. (*Id.* at 2, 28–29.)

## II.  **LEGAL STANDARD**

### A.    **Federal Rule of Civil Procedure 8(a)(2)**

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain "a short and plain statement of the claims showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The primary purpose of Rule 8(a)(2) is "to give the defendant fair notice of the factual basis of the claim[.]" *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 841 (9th Cir. 2007). Therefore, "[a] plaintiff suing multiple defendants 'must allege the basis of his claim against each defendant to satisfy [Rule] 8(a)(2) … .'" *Altman v. PNC Mortg.*, 850 F. Supp. 2d 1057, 1067–68 (E.D. Cal. 2012) (quoting *Gauvin v. Trombatore*, 682 F. Supp. 1067, 1071 (N.D. Cal. 1988)); *see also Holtegaard v. Howroyd-Wright Emp. Agency, Inc.*, Case No. EDCV 20-509 JGB (KKx), 2020 WL 6051328, at *3 (C.D. Cal. Aug. 11, 2020) ("As a general matter, Rule 8(a) requires a plaintiff to differentiate allegations against multiple defendants.") (citation omitted).

### B.    **Federal Rule of Civil Procedure 12(b)(6)**

Pursuant to Rule 12(b)(6), an action may be dismissed for failure to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted). For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s]

factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

However, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Nor is the Court "required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quotation marks omitted).

When a Rule 12(b)(6) motion is granted, "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe v. N. Cal. Collection Serv.*, 911 F.2d 242, 247 (9th Cir. 1990) (citations omitted).

## C. Federal Rule of Civil Procedure 9(b)

Rule 9(b) "requires that, when fraud is alleged, 'a party must state with particularity the circumstances constituting fraud … .'" *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (quoting Fed. R. Civ. P. 9(b)). A pleading satisfies Rule 9(b) if it identifies "the who, what, when, where, and how" of the misconduct charged. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). Rule 9(b) also requires that the complaint "set forth an explanation as to why the statement or omission complained of was false or misleading." *Yourish v. Cal. Amplifier*, 191 F.3d 983, 993 (9th Cir. 1999) (citation and quotation omitted). "To comply with Rule 9(b), allegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th

12

Cir. 2001) (internal quotation marks and citations omitted).  "Any averments which do not meet that standard should be 'disregarded,' or 'stripped' from the claim for failure to satisfy Rule 9(b)."  *Kearns*, 567 F.3d at 1124.

### III.    DISCUSSION

## A.    The Individual Defendants' MTD

"Title 42 U.S.C. § 1983 provides a cause of action for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States.  To state a claim under § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of State law."  *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)).  As the Parties do not seem to dispute that the Individual Defendants were "acting under the color of state law," the Court will focus its analysis on whether Plaintiffs have adequately alleged "a right secured by the Constitution or laws of the United States was violated."  *Id.*

### 1.    Third Cause of Action—Familial Association and Judicial Deception

"The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court."  *Troxel v. Granville*, 530 U.S. 57, 65 (2000).  The Ninth Circuit "has long recognized this right for parents and children under the Fourth and Fourteenth Amendments."  *David v. Kaulukukui*, 38 F.4th 792, 799 (9th Cir. 2022).  "For parents, the right to familial association is generally grounded in the Fourteenth Amendment's Due Process Clause, while claims brought by children are evaluated under the … Fourth Amendment … ."  *Id.* (citation omitted).

"The First Amendment also protects 'family relationships, that presuppose 'deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.'"  *Keates v. Koile*, 883 F.3d 1228, 1236 (9th

13

Cir. 2018) (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001)).  Put simply, the First Amendment protects family relationships.  *Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 545 (1987).  "[T]he Fourteenth, First, and Fourth Amendments [together] provide a guarantee 'that parents will not be separated from their children without due process of law except in emergencies.'"  *Keates*, 883 F.3d at 1236 (quoting *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1107–09 (9th Cir. 2001)).

In addition to the right to familial association guaranteed by the First, Fourth, and Fourteenth Amendments, the Ninth Circuit recognizes "a constitutional right under the Due Process Clause of the Fourteenth Amendment to be free from judicial deception … in the context of civil child custody cases."  *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1146 (9th Cir. 2021) (citations omitted); *see also Costanich v. Dep't of Soc. and Health Servs.*, 627 F.3d 1101,1108 (9th Cir. 2010) ("[D]eliberately fabricating evidence in civil child abuse proceedings violates the Due Process clause of the Fourteenth Amendment when a liberty or property interest is at stake ... .").

"'To successfully allege a violation of the constitutional right to be free from judicial deception, [§ 1983 plaintiffs] must make out a claim that includes (1) a misrepresentation or omission (2) made deliberately or with a reckless disregard for the truth, that was (3) material to the judicial decision."  *Benavidez*, 993 F.3d at 1147 (citation omitted).  Although not explicitly stated, the Ninth Circuit appears to require § 1983 plaintiffs to plead judicial deception with particularity pursuant to Federal Rule of Civil Procedure 9(b).  *See id.* at 1145–49 (applying the Rule 9(b) particularity standard and noting that "[the plaintiffs] had to allege judicial deception sufficient to meet the constitutional standard, if not the heightened pleading standard of Rule 9(b), to overcome the County's motion to dismiss under Rule 12(b)(6).")); *Nick Castaneda, et al., v. County of San Bernardino, et al.*, Case No. 5:23-cv-02246-FWS-JDE, 2024 WL 4834286, at *6 (C.D. Cal. Jan. 17, 2024) ("To comply with Federal Rule of Civil Procedure 9(b), a judicial deception claim must be

stated 'with particularity' by alleging 'the who, what, when, and where of the judicial deception.'") (citation omitted).

The Individual Defendants assert, and Plaintiffs do not dispute, that "Plaintiffs' third cause of action is a § 1983 claim for violation of their right to be free from judicial deception under the Due Process Clause of the Fourteenth Amendment." (Doc. 38-1 at 11.) However, the Individual Defendants do not address Plaintiffs' claims for violations of the right to familial association under the First, Fourth, and Fourteenth Amendments more broadly. Accordingly, Plaintiffs' familial association claims survive the Individual Defendants' MTD, and the Court turns to Plaintiffs' claims regarding judicial deception.

Regarding Plaintiffs' judicial deception claims, the Individual Defendants argue that "nothing in [Plaintiffs'] [C]omplaint plausibly alleges that [] Nienow, Vega, or Laub intended to deceive the court or acted with reckless indifference to the truth, such that any mistakes or incomplete statements in judicial filings could rise to the level of clear constitutional violations." (Doc. 38-1 at 13.) They assert that "[t]he allegations that [] Nienow, [] Vega, or [] Laub did not contact [Minor A.B.'s] other medical providers" amount to negligence at most. (*Id.*) The Individual Defendants also argue that Plaintiffs' Complaint fails to allege that they, as opposed to the County, failed to provide exculpatory evidence. (*Id.* at 14.) Regarding Defendant Vega only, the Individual Defendants assert that she never submitted any documents to the Juvenile Court. (*Id.*) Lastly, the Individual Defendants argue that Plaintiffs' Complaint does not allege that the Individual Defendants made the decision to remove Minor A.B. from her parents' care and custody. (*Id.* at 15.)

In their Opposition to the Individual Defendants' MTD, Plaintiffs respond that they have sufficiently alleged their judicial deception claims against the Individual Defendants. (Doc. 41 at 10–13.) Specifically, Plaintiffs argue that the Individual Defendants and the County social workers were "joint actors" when submitting information to the Juvenile Court. (*Id.* at 12.) Plaintiffs assert that the Individual Defendants omitted critical information from their reports, e.g., that Defendant Nienow did not examine Minor A.B., speak with Martinez, review Minor A.B.'s past medical history, or speak with Minor A.B.'s

15

regular physicians.  (*Id.*)  Plaintiffs conclude that the Individual Defendants "submitted knowingly false reports to the County social workers with the knowledge that such reports would be submitted to the Juvenile Court [for] the purpose [of removing Minor] A.B. from the care and custody of her parents."  (*Id.* at 13.)

Because "[a] plaintiff suing multiple defendants 'must allege the basis of his claim against each defendant to satisfy [Rule] 8(a)(2)[,]'" *Altman v. PNC Mortg.*, 850 F. Supp. 2d 1057, 1067–68 (E.D. Cal. 2012) (quoting *Gauvin*, 682 F.Supp. at 1071), the Court addresses each of the Individual Defendants in turn.

### a)  Nienow

As stated above, to plead judicial deception, "[Plaintiffs] must make out a claim that includes (1) a misrepresentation or omission (2) made deliberately or with a reckless disregard for the truth, that was (3) material to the judicial decision." *Benavidez*, 993 F.3d at 1147.  Regarding the first element, Plaintiffs allege that Defendant Nienow's report falsely implied that she had examined Minor A.B. on January 6, 2022 or January 7, 2022 in her report.  (Compl. ¶ 31.)  Regarding the second element, Plaintiffs allege Nienow opined that Minor A.B. should be removed from her parents' care and custody even though Nienow did not examine Minor A.B., did not speak with Martinez, did not speak with Dr. Swords or Dr. Hightower, and did not review Minor A.B.'s extensive past medical history.  (*Id.* ¶ 19.)  Regarding the last element, Plaintiffs allege that Nienow's report was attached to the Detention Report, which was submitted to the Juvenile Court on January 10, 2022, and that the County social workers' statements and recommendations to the Juvenile Court were based solely on Nienow's report.  (*Id.* ¶ 31.)  Therefore, even applying the more stringent particularity standard, *see Kearns*, 567 F.3d at 1124 (quoting Fed. R. Civ. P. 9(b)), the Court finds that Plaintiffs have adequately stated a claim against Defendant Nienow for judicial deception.  Plaintiffs have alleged the "the who, what, when, where, and how" of the alleged misconduct in way sufficient to give Defendant Nienow notice of the particular conduct allegedly constituting judicial deception.  *Vess*, 317 F.3d at 1106; *see also Bly-Magee*, 236 F.3d at 1019.

### b)    Laub

As to Defendant Laub, Plaintiffs have not alleged any specific misrepresentation or omission by Defendant Laub.  Regarding the second element, Plaintiffs allege that Defendant Laub admitted to a language barrier with respect to getting Minor A.B.'s medical history from Martinez and that there was no evidence that Laub had reviewed any of Minor A.B.'s medical history.  (Compl. ¶ 33.)  Nevertheless, Laub concluded that "the child's physical exam is consistent with a strangulation event" and that she could "not rule out blunt force trauma as well."  (*Id.* ¶ 25.)  Therefore, Plaintiffs have plausibly alleged that Laub's conduct demonstrated a reckless disregard for the truth.  *See Benavidez*, 993 F.3d at 1147.

Regarding the third element, Plaintiffs allege that, on February 15, 2022, the County social workers reported that Laub had not retracted her strangulation theory despite alternative explanations.  (*Id.* ¶ 34.)  Nevertheless, the social workers recommended that the petition be dismissed, and the Juvenile Court gave the social workers discretion to return Minor A.B. to her parents.  (*Id.*)  Because Laub's strangulation theory did not sway the social workers' recommendation or the Juvenile Court's decision on this date, the Court cannot find that Laub's opinion was "material to the judicial decision."  *Benavidez*, 993 F.3d at 1147.  As Plaintiffs have not adequately pled the first and third elements of a judicial deception claim, Plaintiffs' judicial deception claim against Defendant Laub must be **<u>DISMISSED</u>**.

### c)    Vega

In contrast to Defendants Nienow and Laub, Plaintiffs do not allege that Defendant Vega's opinions or reports were ever submitted to the Juvenile Court.  Without any allegations connecting Vega's opinions or reports to any judicial decision, the third element is not sufficiently pled.  *See Benavidez*, 993 F.3d at 1147.  Additionally, Plaintiffs allege that Vega examined Minor A.B. and reviewed Minor A.B.'a medical records.  (Compl. ¶¶ 22–23.)  While Vega may not have spoken with Minor A.B.'s parents, the Court cannot identify any misrepresentation or omission "made deliberately or with a reckless disregard

17

for the truth" when Vega examined Minor A.B. herself and reviewed the available medical records.  *Benavidez*, 993 F.3d at 1147.  Accordingly, the Court finds that Plaintiffs have failed to state a claim for judicial deception against Defendant Vega, and Plaintiffs' judicial deception claim against Vega must be **<u>DISMISSED</u>**.

### d) Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  There is a "two-step sequence for resolving government officials' qualified immunity claims.  First, a court must decide whether the facts that a plaintiff has alleged … or shown … make out a violation of a constitutional right.  Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  *Id.* at 232 (citations omitted).  Having adequately pled a constitutional claim for judicial deception against Defendant Nienow (*see* Section III.A.1.a), the question is whether the right at issue was "clearly established."  *Id.*

The Individual Defendants argue that Nienow is entitled to qualified immunity because, as a mandatory reporter, she was required to report any reasonable suspicion of child abuse to the County.  (Doc. 38-1 at 13–15 (citing Cal. Penal Code §§ 11165.7(a)(21), 11165.9, 11166, 11169.)  The Individual Defendants do not appear to dispute that there is a clearly established right to be free of judicial deception; they merely contend that Nienow's conduct was lawful under state law.  However, Plaintiffs do not wish to hold Nienow civilly liable for merely reporting suspicions of child abuse; Plaintiffs seek to hold Nienow liable for the deceptive nature of her report.  Additionally, "the law of the Ninth Circuit is clear that 'immunity under § 1983 is governed by federal law; state law cannot provide immunity from suit for federal civil rights violations.'"  *Smith v. Harrington*, No. C 12-03533 LB, 2013 WL 132465, at *6 (N.D. Cal. Jan. 9, 2013) (quoting *Wallis v. Spencer*, 202 F.3d 1126, 1144 (9th Cir.2000)); *see also Martinez v. California*, 444 U.S.

18

277, 284, n.8 (1980) ("Conduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 ... cannot be immunized by state law.").

Therefore, at this stage, the Court finds that Plaintiffs' allegations are sufficient to overcome qualified immunity. *See e.g., Moortgat v. Cnty. of San Joaquin*, No. 09-cv-02187-JAM-EFB, 2010 WL 3582430, at *4–5 (E.D. Cal. Sept. 9, 2010) (findings that social workers are not entitled to qualified immunity as mandated reporters); *Jones v. Cnty. of Los Angeles*, Case No.: CV 11-02851 SJO (JCGx), 2011 WL 13152514, at *6 (C.D. Cal. Aug. 26, 2011) (confirming that the "Ninth Circuit has yet to address the issue of California physician's immunity under the federal qualified immunity standard for reporting suspected child abuse" and noting "[w]here neither the Ninth Circuit nor a sister district court has extended such immunities to physicians, the Court is disinclined to do so, especially at the motion to dismiss stage."). Plaintiffs' judicial deception claim against Defendant Nienow may proceed.

### 2.    Fourth Cause of Action—Medical Examinations

"The right to family association includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state." *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000) (citing *Parham v. J.R.*, 442 U.S. 584, 602 (1979) and *Calabretta v. Floyd*, 189 F.3d 808, 818 (9th Cir.1999)). "Moreover, parents have a right arising from the liberty interest in family association to be with their children while they are receiving medical attention (or to be in a waiting room or other nearby area if there is a valid reason for excluding them while all or a part of the medical procedure is being conducted). Likewise, children have a corresponding right to the love, comfort, and reassurance of their parents while they are undergoing medical procedures, including examinations—particularly those, such as here, that are invasive or upsetting." *Id.* at 1142 (footnote omitted). "[T]he 'children's right to their [parents'] comfort and their [parents'] right to provide such comfort [are] at their apex' where the medical examination included inspection of … the child's genitals." *Benavidez*, 993 F.3d at 1150.

19

3:23-cv-02338-RBM-AHG

For this reason, in *Wallis*, the Ninth Circuit held that the "Constitution assures parents that, in the absence of parental consent, physical examinations of their child may not be undertaken for investigative purposes at the behest of state officials unless a judicial officer has determined, upon notice to the parents, and an opportunity to be heard, that grounds for such an examination exist and that the administration of the procedure is reasonable under all the circumstances." *Wallis*, 202 F.3d at 1142 (quotation omitted). The Ninth Circuit elaborated that "[b]arring a reasonable concern that material physical evidence might dissipate, or that some urgent medical problem exists requiring immediate attention, the state is required to notify parents and to obtain judicial approval before children are subjected to investigatory physical examinations." *Id.* (quotation omitted).

Following *Wallis*, the Ninth Circuit concluded "that the County violates *parents' Fourteenth Amendment substantive due process rights* when it performs … medical examinations [at Polinsky] without notifying the parents about the examinations and without obtaining either the parents' consent or judicial authorization." *Mann v. Cnty. of San Diego*, 907 F.3d 1154, 1160–61 (9th Cir. 2018) (emphasis added). The Ninth Circuit also concluded that "*children possess a Fourth Amendment right* to 'be secure in their persons ... against unreasonable searches and seizures.'" *Id.* at 1164 (citing U.S. Const. amend. IV) (finding that "Polinsky medical examinations … are well within the ambit of the Fourth Amendment"). Relatedly, "[c]hildren removed from their parents' custody [also] have a legitimate expectation of privacy in not being subjected to medical examinations without their parents' notice and consent." *Id.* at 1165 (citations omitted).

In sum, medical examinations in this context violate parents' Fourteenth Amendment substantive due process rights and children's Fourth Amendment rights against unreasonable searches and seizures. *See Benavidez*, 993 F.3d at 1150. For this reason, the Ninth Circuit has found that "the County is required to: (1) notify the parents of a medical examination of their children; (2) obtain parental consent or a court order in advance of the medical examination; and (3) permit the parent to be present at the examination." *Id.*

3:23-cv-02338-RBM-AHG

In their MTD, the Individual Defendants argue that Defendant Nienow could not have violated Plaintiffs' constitutional rights pertaining to medical examinations because she never examined Minor A.B. herself.  (Doc. 38-1 at 16–17.)  The Individual Defendants also argue that Defendants Vega and Laub are entitled to qualified immunity because "Plaintiffs do not identify any clearly established law that indicates a medical professional who suspects child abuse must obtain the consent of persons who might be the abusers to perform such an examination."  (*Id.* at 17.)

In their Opposition to the Individual Defendants' MTD, Plaintiffs assert that the Individual Defendants collaborated and jointly acted with the County in recommending and conducting the challenged medical examinations.  (Doc. 41 at 14.)  Plaintiffs assert that, in her report, Defendant Nienow advised the County that Minor A.B. should be seen at Chadwick for a full forensic examination.  (*Id*. at 15.)  Plaintiffs then contend that Defendant Vega examined Minor A.B. on January 7, 2022, even though Martinez and Bernal did not consent to this examination, were not given notice of the examination, were not given the opportunity to be present at the examination, and there was no court order authorizing the examination.  (*Id.*)  Plaintiffs do not present any arguments regarding Defendant Laub.

As a preliminary matter, and as stated above (*see* Section III.A), the Individual Defendants do not appear to dispute Plaintiffs' assertion that that the doctors collaborated and acted jointly with the County in examining Minor A.B..  (*See* Doc. 41 at 13–15.)  Accordingly, at this stage, the Court finds that Plaintiffs have sufficiently alleged that the Individual Defendants acted under the color of state law.  *See Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980) ("Private persons, jointly engaged with state officials in the challenged action, are acting see 'under color' of law for purposes of § 1983 actions.").

The Court now turns to whether the Individual Defendants violated "a right secured by the Constitution or laws of the United States[.]"  *Long*, 442 F.3d at 1185.  Because "[a] plaintiff suing multiple defendants 'must allege the basis of his claim against each defendant to satisfy [Rule] 8(a)(2)[,]'"  *Altman*, 850 F. Supp. 2d at 1067–68 (quoting

21

*Gauvin*, 682 F. Supp. at 1071), the Court addresses each of the Individual Defendants in turn.

### a)    Nienow

Plaintiffs allege that Defendant Nienow examined photographs taken in the emergency room and, based on those photographs, advised the County social workers that Minor A.B. should be subjected to a full forensic examination. (Compl. ¶ 19.) Upon Nienow's recommendation, Minor A.B. was removed from her parents' custody and care and transported to Polinsky. (*Id.* ¶ 21.) The next day, Minor A.B. was examined by Defendants Vega and Laub. (*Id.* ¶¶ 22–27.) Martinez and Bernal were not notified of this examination, were not given the opportunity to be present at this examination, did not consent to this examination, and there was no court order authorizing the examination. (*Id.* ¶ 22.)

Despite the Individual Defendants' contention that Defendant Nienow could not have violated Plaintiffs' constitutional rights pertaining to medical examinations because she never examined Minor A.B. (*see* Doc. 38-1 at 16), the Court finds that Plaintiffs' allegations are sufficient to withstand the Individual Defendants' MTD. The Individual Defendants' have not cited any authority suggesting that only the examining physicians can be held liable for unlawful medical examination. Further, while Nienow may not have examined Minor A.B. herself, it is upon her recommendation that the County subjected Minor A.B. to a full forensic examination. As a physician acting under the color of state law at the time of the examination, Nienow should have ensured that (1) Minor A.B.'s parents were notified of the medical examination; (2) Minor A.B.'s parents consented, or a court order was obtained, in advance of the medical examination; and (3) Minor A.B.'s parents were permitted to be present at the examination. *See Benavidez*, 993 F.3d at 1150. Thus, "accept[ing] [the] factual allegations in the [C]omplaint as true and constru[ing] the pleadings in the light most favorable to [Plaintiffs,]" *Manzarek*, 519 F.3d at 1031, the Court finds that Plaintiffs' allegations are sufficient to withstand the Individual Defendants' MTD.

### b) Vega and Laub

Plaintiffs allege that Defendants Vega and Laub examined Minor A.B. on January 7, 2022.  (Compl. ¶¶ 22–27.)  This examination included an examination to rule out sexual abuse.  (*Id.* ¶ 25.)  Vega and Laub also recommended that urine be collected.  (*Id.*)  Upon this recommendation, the County collected a urine sample in a subsequent examination at Polinsky.  (*Id.* ¶ 27.)  Martinez and Bernal were not notified of these examinations, were not given the opportunity to be present at these examinations, did not consent to these examinations, and there was no court order authorizing these examinations.  (*Id.* ¶¶ 22, 27.)  As physicians acting under the color of state law at the time of the examination, Vega and Laub should have ensured that (1) Minor A.B.'s parents were notified of the medical examination; (2) Minor A.B.'s parents consented, or a court order was obtained, in advance of the medical examination; and (3) Minor A.B.'s parents were permitted to be present at the examination.  *See Benavidez*, 993 F.3d at 1150.  Yet, they did not.  Thus, "accept[ing] [the] factual allegations in the [C]omplaint as true and constru[ing] the pleadings in the light most favorable to [Plaintiffs,]" *Manzarek*, 519 F.3d at 1031, the Court finds that Plaintiffs' allegations are sufficient to withstand the Individual Defendants' MTD.

### c) Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson*, 555 U.S. at 231.  There is a "two-step sequence for resolving government officials' qualified immunity claims.  First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right.  Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  *Id.* at 232 (citations omitted).  Having adequately pled constitutional claims for unlawful medical examinations against the Individual Defendants (*see* Sections III.A.2.a–c), the question now is whether the right at issue was "clearly established."  *Id.*

23

Here, the Individual Defendants argue that Defendants Vega and Laub are entitled to qualified immunity because "Plaintiffs do not identify any clearly established law that indicates a medical professional who suspects child abuse must obtain the consent of persons who might be the abusers to perform such an examination." (Doc. 38-1 at 17.) However, the Ninth Circuit has long held that "[t]he right to family association includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents … ." *Wallis*, 202 F.3d at 1141 (citations omitted)). "Moreover, parents have a right … to be with their children while they are receiving medical attention …. Likewise, children have a corresponding right to the love, comfort, and reassurance of their parents while they are undergoing medical procedures, including examinations … ." *Id.* at 1142. It is also "clearly established" that "the County is required to: (1) notify the parents of a medical examination of their children; (2) obtain parental consent or a court order in advance of the medical examination; and (3) permit the parent to be present at the examination." *Benavidez*, 993 F.3d at 1150.

In light of this precedent, the Court finds it is "clearly established" that, as physicians working in concert with the County under the color of state law, the Individual Defendants' should have ensured that (1) Minor A.B.'s parents were notified of the medical examination; (2) Minor A.B.'s parents consented, or a court order was obtained, in advance of the medical examination; and (3) Minor A.B.'s parents were permitted to be present at the examination. *See id.* at 1150–1153. Therefore, Plaintiffs' claims related to the physical examinations of Minor A.B. are not barred by qualified immunity.

### 3.    Seventh Cause of Action—Injunctive Relief

"Injunctive relief is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Williams v. Cnty. of San Diego*, 523 F. Supp. 3d 1183, 1202 (S.D. Cal. 2021) (quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008)). "To obtain injunctive relief, 'a plaintiff must show that he has suffered or is threatened with a 'concrete and particularized' legal harm, coupled with the 'sufficient

24

likelihood that he will again be wronged in a similar way.'"" *Id.* (quoting *Canatella v. State of California*, 304 F.3d 843, 852 (9th Cir. 2002)).

As explained above, Plaintiffs have adequately alleged constitutional claims against each of the Individual Defendants.  Therefore, the Court only considers whether injunctive relief may ultimately be appropriate as a remedy for the purported constitutional violations. *See id.*  The Court finds that Plaintiffs have not pled any specific facts suggesting that they wronged again "in a similar way." *Id.*  Defendants correctly note that Plaintiffs have not alleged that they will continue to seek care from Rady or the Individual Defendants and that any threat of future harm to Martinez, Bernal, and Minor A.B. is speculative at best. (Doc. 38-1 at 18.)   Accordingly, Plaintiffs' claims for injunctive relief against the Individual Defendants are **<u>DISMISSED</u>**.

**B.   Rady's MTD**

Plaintiffs assert two claims for relief against Rady.  Plaintiffs' sixth claim is for *Monell*-related claims pursuant to § 1983. (Compl. at 1, 25–28.)  Plaintiffs' seventh claim is for injunctive relief.  (*Id.* at 2, 28–29.)  The Court addresses each claim for relief in turn.

### 1.    Sixth Cause of Action—*Monell*

"To make out a [§ 1983] claim against [Rady] under *Monell*, [Plaintiffs] must show that (1) [Rady] acted under color of state law, and (2) if a constitutional violation occurred, the violation was caused by an official policy or custom of [Rady]." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) (citing *Harper v. City of Los Angeles*, 533 F.3d 1010, 1024 (9th Cir.2008)).[5]  "[A]n entity does not enjoy qualified immunity from suit

---

[5] Rady does not seem to dispute that it was "acting under the color of state law," so the Court will not address it below.  Even if the Court were to interpret Rady's factual arguments as pertaining to the "under the color of state law" prong, the Court finds that, at this stage, Plaintiffs have alleged that Rady acted under the color of state law.  *See e.g., N.L. by & through Arce v. Childrens Hosp. Los Angeles*, 711 F. App'x 433, 433–34 (9th Cir. 2018) ("The factual allegations in the operative complaint … give rise to a plausible inference that [Children's Hospital Los Angeles] acted under color of state law."); *Meyer v. Cnty. of San Diego*, Case No.: 21-cv-00341-GPC, 2021 WL 4924836, at *9 (S.D. Cal.

under § 1983." *N.L. v. Children's Hosp. Los Angeles*, No. CV 15-07200-AB (FFMx), 2019 WL 10854340, at *6 (C.D. Cal. Oct. 22, 2019) (citing *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 166–67 (1993)).

In its MTD, Rady argues that (a) Plaintiffs fail to plead any underlying constitutional violation necessary to trigger *Monell* liability, (b) Plaintiffs fail to identify any policy or custom to support *Monell* liability, and (c) that Plaintiffs do not allege that Rady failed to train its employees. (Doc. 37-1 at 9–16.) The Court addresses each argument in turn.

### a)    Underlying Constitutional Violations

Regarding the underlying constitutional violations, Rady argues that Plaintiffs only allege the fabrication of statements and the omission of exculpatory evidence by the County and its social workers, not Rady. (Doc. 37-1 at 10.) Rady also argues that it is the County, not Rady, that is required to notify parents and obtain parental consent or a court order for medical examinations of minors. (*Id.* at 10–11.) However, as set forth above (*see* Section III.A), Plaintiffs have stated constitutional claims against Defendants Nienow, Vega, and Laub, who are physicians contracted to conduct forensic examinations at Rady (*see* Compl. ¶¶ 3–5). Accordingly, Plaintiffs have adequately alleged underlying constitutional violations sufficient to support a *Monell* claim against Rady.

Rady also attempts to avoid *Monell* liability by arguing that the Individual Defendants are not Rady employees. (*See* Doc. Doc. 37-1 at 6 (citing Cal. Bus. & Prof. Code § 2400, *et seq.* [the "Medical Practices Act"]); Doc. 43 at 2–3.) However, Rady has not identified any authority that precludes *Monell* liability on this distinction alone. Further, while Rady may not employ the Individual Defendants directly (*see* Cal. Bus. & Prof. Code § 2400), the Court cannot assume at this stage that no other type of agency relationship exists. *See e.g., Ermoian v. Desert Hosp.*, 152 Cal. App. 4th 475, 510 (2007)

Oct. 21, 2021) ("Whether this allegation supports Rady's characterization as a state actor is a close call. … However, the allegation[s] … , at this stage, [are] sufficient to allege the requisite nexus between state and private entity.").

(finding an ostensible agency relationship between a hospital and physicians employed by the hospital's outpatient maternity services clinic).  Plaintiffs' *Monell* claim is not subject to dismissal on this basis alone.

### b)   Policy, Custom, or Pattern

To establish *Monell* liability against Rady, "[Plaintiffs] must demonstrate that an 'official policy, custom, or pattern' on the part of [Rady] was 'the actionable cause of the claimed injury.'" *Tsao, Inc.*, 698 F.3d at 1143 (citing *Harper*, 533 F.3d at 1024).  "A 'policy' is 'a deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.' " *Id.* (quoting *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir.2006)).  There are "two types of policies: those that result in the [private entity] itself violating someone's constitutional rights or instructing its employees to do so, and those that result, through omission … .'" *Id.*  The Ninth Circuit has "referred to these two types of policies as policies of action and inaction." *Id.* (citing *Long*, 442 F.3d at 1185).

"Absent a formal [] policy, [Plaintiffs] must show a 'longstanding practice or custom which constitutes the standard operating procedure of the [] entity.'" *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992)).  "The custom must be so 'persistent and widespread' that it constitutes a 'permanent and well settled [] policy.'" *Id.* (quoting *Monell v. Dept. of Soc. Serv. of N.Y.*, 436 U.S. 658, 691 (1978)).  "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Id.* (citations omitted).

The crux of Rady's arguments in its MTD is that Plaintiffs' *Monell* allegations are conclusory, lack specificity, and pertain only to Plaintiffs' own experiences. (*See* Doc. 37-1 at 12–14.)  Plaintiffs respond by restating the allegations in their Complaint.  (*See* Doc. 40 at 11–16.)   After careful consideration of the allegations set forth in Plaintiffs'

Complaint, the Court finds that, at this stage, Plaintiffs have adequately stated a claim for *Monell* liability against Rady. *See Manzarek*, 519 F.3d at 1031.

Plaintiffs allege that Rady, Chadwick, and the Chadwick team routinely work with the County, its HHSA, law enforcement, and the courts to investigate suspected child abuse and neglect. (Compl. ¶¶ 38, 40, 84.) Rady and its Chadwick team initiate, authorize, and conduct non-consensual and unwarranted forensic interviews and medical examinations. (*Id.* ¶ 40.) The Complaint specifically alleges that Rady, through its team at Chadwick, has conducted as many as 769 forensic medical exams at the behest of the County's HHSA without first obtaining court approval or authorization. (*Id.* ¶ 41.) Plaintiffs claim that this policy of conducting medical examinations on children removed from their parents without exigent circumstances, a court order, a warrant, or parental consent violates the constitutional right of the children and the parents, including Minor A.B. (*Id.* ¶ 85a.) The Court finds that these allegations are detailed and sufficient to state a *Monell* claim against Rady at this stage. *See Manzarek*, 519 F.3d at 1031.

Similarly, Plaintiffs allege that Defendant Nienow's report was deceptive because it clearly (and falsely) implied that she had examined Minor A.B. on January 6, 2022 or January 7, 2022. (Compl. ¶ 31.) Nienow opined that Minor A.B. be removed from her parents' care and custody even though Nienow did not examine Minor A.B., did not speak with Martinez, did not speak with Dr. Swords or Dr. Hightower, and did not review Minor A.B.'s extensive past medical history. (*Id.* ¶ 19.) The County social workers' statements and recommendations to the Juvenile Court were based solely on Nienow's report, which was attached to the Detention Report submitted to the Juvenile Court on January 10, 2022. (*Id.* ¶ 31.) Plaintiffs then conclude that Rady's policy of providing expert opinions to the County based on insufficient information results in constitutional violations, like the ones at issue here, as well as other legal actions.[6] (*Id.* ¶ 85b.) The Court finds that these

---

[6] The Court has also identified similar actions against Rady. *See e.g., Meyer*, 2021 WL 4924836, at *1–2; *JQ.H by & through Thomas v. Cnty. of San Diego*, No. 18-CV-924-

allegations are detailed sufficient to state a *Monell* claim against Rady at this stage.  *See Manzarek*, 519 F.3d at 1031.

### c) Inadequate Training

Because the Court finds that Plaintiffs have adequately alleged at least one policy or custom sufficient to state a *Monell* claim against Rady, the Court need not address Plaintiffs' inadequate training allegations (*see* Compl. ¶ 85c–d).  *See Tsao*, 698 F.3d at 1139 ("To create liability under § 1983, the constitutional violation must be caused by 'a policy, practice, or custom of the entity,' <u>or</u> be the result of an order by a policy-making officer.") (citations omitted) (emphasis added).

### 2. Seventh Cause of Action—Injunctive Relief

Because the Court finds that Plaintiffs have adequately alleged a *Monell* claim against Rady, Plaintiffs have also alleged a claim for injunctive relief against Rady.  *See Los Angeles Cnty. v. Humphries*, 562 U.S. 29, 39 (2010) ("We hold that *Monell*'s 'policy or custom' requirement applies in § 1983 cases irrespective of whether the relief sought is monetary or prospective.").

## IV.  <u>CONCLUSION</u>

Based on the foregoing, the Individual Defendants' MTD is **<u>GRANTED IN PART</u>** and **<u>DENIED IN PART</u>**.  Plaintiffs' claims for judicial deception against Defendants Vega and Laub are **<u>DISMISSED</u>** with leave to amend.  Plaintiffs' claims for injunctive relief against all of the Individual Defendants are **<u>DISMISSED</u>** with leave to amend.  Plaintiffs remaining claims against the Individual Defendants may proceed.

Rady's MTD is **<u>DENIED</u>** in its entirety.

Should Plaintiffs choose to file amended claims for judicial deception against Defendants Vega and Laub, or for injunctive relief as to all of the Individual Defendants,

---

BTM-AHG, 2020 WL 13178589, at *2 (S.D. Cal. Oct. 7, 2020); *Harris v. Cnty. of San Diego*, No. 18-cv-924-BTM-AHG, 2019 WL 6683367, at *1 (S.D. Cal. Dec. 5, 2019).

Plaintiffs must file their amended complaint on or before January 9, 2025. Defendants' response to any amended complaint must be filed on or before January 30, 2025.

Should Plaintiffs choose not to amend their judicial deception claims against Defendants Vega and Laub, or their injunctive relief claims against all of the Individual Defendants, Defendants must answer Plaintiffs' Complaint on or before January 9, 2025.

**IT IS SO ORDERED.**

DATE:  December 20, 2024

HON. RUTH BERMUDEZ MONTENEGRO
UNITED STATES DISTRICT JUDGE

3:23-cv-02338-RBM-AHG